**Martin ALLRED, Plaintiff–Appellee,**

v.

**MAERSK LINE, LIMITED, Defendant–Appellant.**

No. 93–2029.

United States Court of Appeals, Fourth Circuit.

Argued May 11, 1994.

Decided Sept. 13, 1994.

**ARGUED:** John Morgan Ryan, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for appellant. Melvin J. Radin, Norfolk, VA, for appellee. **ON BRIEF:** R. John Barrett, Thomas J. Duff, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for appellant.

Before HAMILTON and MICHAEL, Circuit Judges, and KNAPP, Senior United States District Judge for the Southern District of West Virginia, sitting by designation.

Reversed in part and remanded by published opinion. Judge MICHAEL wrote the opinion, in which Judge HAMILTON and Senior Judge KNAPP joined.

## OPINION

MICHAEL, Circuit Judge:

Maersk Line, Limited appeals a personal injury judgment entered in favor of its employee, Martin Allred. After a one-day trial the jury found that Maersk was negligent under the Jones Act (46 U.S.C. app. § 688) and that Maersk's vessel was unseaworthy. The jury awarded Allred $1 million in damages. The district court dealt with Maersk's motion for a new trial in stages. The court first refused to grant a new trial on liability. Then, after Allred agreed to a remittitur of $500,000, the court denied Maersk a new trial on damages and judgment was entered in Allred's favor for $500,000. 826 F.Supp. 965. An error in jury instruction requires us to reverse the judgment in part and remand for a new trial on damages only.

### I.

Allred, a merchant seaman, was employed by Maersk on board the M/V PFC William B. Baugh. Allred was a "wiper/utility man" in the vessel's engineering department. In November 1990, while the vessel was docked in Saudi Arabia, a steam pipe located over-head in a cargo hold developed a leak. Allred was assigned to help Christopher Madden, a second assistant engineer, weld the leaking pipe, which was about twenty feet above the metal deck. To enable Madden and Allred to reach the pipe, an elevated working platform was pieced together as follows. A forklift was brought to the vessel from a U.S. Army dockside operation. A wooden pallet was placed on the forks of the lift and raised to a height that allowed the men to reach the leaking pipe. An aluminum ladder, which was not fastened in any way, was used to mount the platform on the raised lift.

On November 6, 1990, Allred, at Madden's direction, descended the platform to turn on the welding machine. As Allred was climbing back up to the platform, the ladder slipped and both he and the ladder fell to the deck. Allred fractured his left elbow in the fall, and the fracture left some permanent injury.

At trial three doctors rated the permanent partial disability to Allred's arm at points or ranges between 20 and 30 percent. One doctor said that surgery might reduce the disability rating to 15 percent. That doctor also opined that degenerative or arthritic changes might occur in the elbow over time. Although Allred acknowledged that he could still perform most functions normally, he also said (1) he had ongoing pain which was exacerbated by heavy lifting, (2) he had some difficulty working with his arms over his head or extended in front of him, (3) he could not perform as well in sports as he had previously, and (4) the accident left his injured left arm shorter than the right one.

Maersk paid all of Allred's medical bills, wages, and disability compensation, and Allred returned to work in January 1991. Thus, there was no evidence submitted on either past or future lost wages.

Maersk requested the following jury instruction among others: "the plaintiff will not be required to pay either State or Federal income taxes on any judgment which may be awarded as a result of this suit." JA 160. The district court refused the instruction,

saying that it was improper because Allred was not seeking any lost wages.

The jury found Maersk liable and awarded Allred $1 million in damages. Maersk moved for a new trial on both liability and damages. The district court denied the motion for a new trial as to liability. However, after finding that "$500,000 is the maximum sum that a jury could reasonably have awarded," the district court conditionally denied Maersk's motion for a new trial on damages:

> Defendant's motion for a new trial on damages alone is CONDITIONALLY DENIED pending Plaintiff's decision upon whether or not to accept an award of damages in the amount of $500,000. Should Plaintiff not consent to this remittitur, a new trial shall be granted on the issue of damages alone.

JA 149. Allred agreed to the remittitur, and the court denied Maersk's motion for a new trial on damages. Judgment was then entered in Allred's favor for $500,000.

Maersk appeals, arguing that the district court erred (1) in refusing to give the requested tax instruction, (2) in denying a new trial on all issues and (instead) ordering a remittitur, (3) in ordering a remittitur of only $500,000, and (4) in admitting evidence of what Maersk claims was a subsequent remedial measure. We agree with Maersk on one point: In a Jones Act case it is error for the trial court to refuse to instruct the jury that any award of damages would not be subject to income taxation.

## II.

The Internal Revenue Code provides that gross income does not include "the amount of any damages received ... on account of per-sonal injuries or sickness...." 26 U.S.C. § 104(a)(2). The issue of the refused instruction on non-taxability is governed by *Norfolk & W. Ry. v. Liepelt,* 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), a wrongful death case brought under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51–60. In *Liepelt,* the Supreme Court held that the trial judge erred in refusing to instruct the jury that any damage award would not be subject to income taxes.[1] We believe it instructive to set out the Supreme Court's reasoning in *Liepelt* in some detail. The Court began by saying:

> Although the law [exempting personal injury awards from income tax] is perfectly clear, it is entirely possible that the members of the jury may assume that a plaintiff's recovery in a case of this kind will be subject to federal taxation, and that the award should be increased substantially in order to be sure that the injured party is fully compensated.

*Id.* at 496, 100 S.Ct. at 759. The Court supported this premise by quoting Judge Aldisert in *Domeracki v. Humble Oil & Refining Co.,* 443 F.2d 1245, 1251 (3d Cir.), *cert. denied,* 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 165 (1971):

> "We take judicial notice of the 'tax consciousness' of the American public. Yet, we also recognize ... that few members of the general public are aware of the special statutory exception for personal injury awards contained in the Internal Revenue Code.

> "[T]here is always danger that today's tax-conscious juries may assume (mistakenly of course) that the judgment will be taxable and therefore make their verdict

---

1. In *Liepelt* the Supreme Court noted, "[w]hether it was error to refuse [the non-taxability] instruction ... is a matter governed by federal law. It has long been settled that questions concerning the measure of damages in a FELA action are federal in character." *Id.* at 492–93, 100 S.Ct. at 757. *Liepelt* applies to this case, a Jones Act case, because the Jones Act expressly incorporates FELA's available remedies. 46 U.S.C. app. § 688; *see Ageloff v. Delta Airlines Inc.,* 860 F.2d 379, 390 (11th Cir.1988) (*Liepelt "requires* in cases arising under the FELA ... (incorporated in the Jones Act, 46 U.S.C. app. § 688) an instruction that a damage award will not be sub-ject to federal income taxation") (emphasis in original); *see also Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 486, 487 n. 17, 101 S.Ct. 2870, 2880, 2880 n. 17, 69 L.Ed.2d 784 (1981) (*Liepelt's* "holding articulated a federal common-law rule" and "[n]one of the Court's reasoning was directed particularly at FELA"); *Losey v. North Am. Philips Consumer Elecs. Corp.,* 792 F.2d 58, 62 (6th Cir.1986) (*Liepelt* "was founded squarely on the special nature of FELA cases and is therefore limited to cases involving the FELA *or similar federal legislation"*) (emphasis added); Graham Douthwaite, *Jury Instructions on Damages in Tort Actions* 67 (1988).

big enough so that plaintiff would get what they think he deserves after the imaginary tax is taken out of it.'"

*Liepelt,* 444 U.S. at 497, 100 S.Ct. at 759 (citations omitted).

In *Liepelt,* after noting that the jury award was more than double the monetary loss figured by the plaintiff's expert, the Supreme Court concluded: "It is surely not fanciful to suppose that the jury erroneously believed that a large portion of the award would be payable to the Federal Government in taxes, and that therefore it improperly inflated the recovery." *Id.*

In *Cazad v. Chesapeake & Ohio Ry. Co.,* 622 F.2d 72, 76 (4th Cir.1980), a FELA case brought by an injured railroad employee, we applied *Liepelt* and held that the district court erred in refusing a requested instruction to the jury that " 'any award made to plaintiff as damages . . . is not subject to federal or state income taxes, and you should not consider such taxes in fixing the amounts of any award. . . .' "

Allred attempts to distinguish *Liepelt* by pointing out that only lost wage damages were at issue there. According to Allred, the tax instruction was mandated in *Liepelt* only because the Court first held that it was error to exclude evidence about the effect of income taxes on the decedent's estimated future earnings. Allred thus argues that *Liepelt* applies only to cases involving lost wage damages; he says it does not apply to cases (such as his) involving damages for non-wage items such as pain and suffering and disfigurement.

■ Allred reads *Liepelt* too narrowly. *Liepelt* was concerned with the general tax consciousness of the public and juries. 444 U.S. at 496–97, 100 S.Ct. at 759. If anything, that consciousness has been heightened since the days of *Liepelt.* And we do not think jurors limit their concern about the taxability of awards just to those for lost wages. The public frequently sees news stories about the taxability of many categories of non-wage income such as winnings from sweepstakes, lotteries and gambling.[2] It is logical for juries to assume that other sources of non-wage income (such as pain and suffering awards in lawsuits) are also taxable. Indeed, *Liepelt* speaks of the dangers of mistaken beliefs about the taxability of personal injury *judgments;* it does not distinguish between the wage and non-wage elements of those judgments. We must therefore reject Allred's argument that *Liepelt* applies only to cases seeking lost wages. It was reversible error for the district court to refuse the non-taxability instruction.

### III.

■ We have reviewed the record thoroughly and we are convinced that the district court did not abuse its discretion in denying that portion of Maersk's motion which sought a new trial as to liability. In addition, the district court did not abuse its discretion in admitting the redacted version of the captain's report of Allred's accident. The version admitted simply did not identify any subsequent remedial measure taken by Maersk. *See* Fed.R.Evid. 407. Finally, because we remand for a new trial on damages, we need not reach the issues relating to the remittitur.

### IV.

The district court's judgment as to liability stands. However, we reverse the judgment as to damages and remand the case for a new trial on damages.

*REVERSED IN PART AND REMANDED.*

---

2. For example, the following headline recently appeared in the *Chicago Tribune: One Sure Bet: IRS Will Get Part of Your Winnings; Even if* *Gambling Business Doesn't Withhold Money for Taxes, You Must Report It for Taxes,* Chi. Trib., July 20, 1994, at C3.