413 So.2d 611 (1982)
Joseph F. HIRSTIUS
v.
LOUISIANA MATERIALS COMPANY, INC.
No. 14669.
Court of Appeal of Louisiana, First Circuit.
April 13, 1982.
Writ Denied June 4, 1982.
*612 Richard L. Muller, Mandeville, for plaintiff, appellee.
Elton T. Harvey, III, New Orleans, for defendant, appellant.
Before ELLIS, PONDER and SAVOIE, JJ.
ELLIS, Judge.
This is a suit for damages for personal injuries brought by Joseph F. Hirstius against Louisiana Materials Company, Inc. Mr. Hirstius was injured while working aboard the floating shell dredge Greenville in Lake Pontchartrain, which is a navigable body of water. This case is brought under the Federal Maritime Law and the Jones Act, 46 U.S.C. § 688, and may be brought in state court under the "Saving to Suitors" clause of the Judiciary Act of 1789, 28 U.S.C. § 1333. Trial was held on the merits, without a jury, and judgment was rendered in favor of plaintiff and against defendant for $284,335.90, with interest from date of judicial demand. According to the reasons for judgment, the award was composed of $75,000.00 for disability, past and future pain and suffering, and future medical expenses; $41,279.20 for lost wages, less a $6,943.30 stipulated credit; and $175,000.00 for future economic loss. From this judgment, defendant has appealed.
In this court, defendant claims that the trial court erred in failing to reduce the award because of plaintiff's own negligence, and alleges that the award is otherwise excessive or erroneous in a number of respects.
The record reveals that plaintiff was an experienced dredge boat engineer, and was employed by defendant on July 18, 1977, as a chief engineer on board the shell dredge Greenville. As such, plaintiff was in charge of the operations and maintenance of the mechanical equipment and appurtenant spaces of the dredge. Under ordinary circumstances, he was to be assisted by an oiler in the engine room.
Plaintiff testified that, when he began work, the engine room space was extremely dirty, and that he immediately began cleaning it, and repainting the deck. However, by the time of the accident, he was less than half finished. On the day of the accident, July 28, 1977, the dredge was not in operation because the engine had been running hot, and repairs were being made. On board were the captain, his assistant, named Joe Crowe, two mechanics, and *613 plaintiff. There was no oiler, because Crowe, who had been the oiler, had been promoted, and his former position had not been filled.
The deck of the engine room is about 35 inches below the main deck of the dredge. The main engine sits on the bottom of the dredge, and has a walkway on either side of it, which is either 26½ or 34½ inches below the engine room deck. At the time of the accident, there were no steps leading from the engine room deck to the walkway.
On the day of the accident, plaintiff was engaged in cleaning the air filters which are located at the front end of the main engine. Each filter is about two feet square, and weighs, when clean, about 35 pounds. He had completed cleaning one of the filters and was carrying it back to replace it on the engine. Plaintiff was attempting to step down from the engine room deck to the walkway with his left foot, when he slipped and fell, injuring his left knee. He was not sure what caused him to fall, but assumed it was oil or grease on the walkway.
In this court, defendant no longer disputes the unseaworthiness of the dredge, but claims that the award should be reduced because of plaintiff's own negligence. It is alleged that plaintiff was the person primarily responsible for the condition of the engine room so that he must have been aware of the oil or grease on the walkway; that he was an experienced engineer, and should have realized that the manner in which he was carrying the filter down to the walkway was dangerous; that there were less dangerous ways of doing the job of which he should have been aware; and that he could have called for help from the other personnel aboard.
In answer to the above, plaintiff testified that he had not been on the job long enough to get the engine room cleaned up, and that others who were cleaning the oil filters had spilled oil on the walkway on the day of the accident. He further stated that the deck of the engine room was so cluttered that he could not put down the filter before climbing down to the walkway without running the risk of having it fall or become dirty, and that he felt he had no alternative but to do what he did. He further testified that the other personnel on board had jobs of their own to do, and that he had been told that Crowe was no longer available to him as an assistant.
We find that the trial judge correctly resolved the issue. Plaintiff's injury was caused, not by his inattention or negligence, but by the conditions under which he was working. His choice of an awkward method of getting the filter from the engine room deck to the walkway was dictated by the condition of the vessel, the cluttered condition of the engine room deck, and the other work which was being carried out at the same time. We find no negligence on plaintiff's part.
As to the award, defendant makes several complaints. First it is argued that the award of $75,000.00 for past and future pain and suffering, disability and future medical expense is erroneous because it was based in part on the finding by the trial court that the treating physician stated that plaintiff would at some future time require a total knee replacement. Defendant correctly points out that the doctor's testimony was that a total knee replacement was a possibility in the future, but not recommended at the time of the deposition. The record further reveals, however, that plaintiff's knee condition, which has existed since July 28, 1977, has been and is painful and that plaintiff is disabled to perform any kind of active employment. There seems little likelihood that plaintiff will improve, or that he will be without pain in his knee in the future. Under those circumstances, we find the award to be appropriate, despite the minor error of fact made by the trial judge.
The other three assignments of error as to the award are that the judge erred in considering inflation as a factor in computing future economic loss; that the judge miscalculated the plaintiff's gross wages on which the award was based; and that the judge erred in awarding pre-judgment interest.
*614 On the question of economic loss, the record shows that plaintiff was born on May 4, 1924, and had a fifth grade education. There is no serious dispute that he is totally and permanently disabled to do work of any reasonable character because of his knee injury. His earnings record shows that he earned $16,026.00 in 1973, $15,567.00 in 1974, $15,472.00 in 1975, $6,697.00 in 1976, and $4,569.00 in 1977, the year of his injury. We are satisfied that the decline in income between 1975 and 1976 is due to circumstances which were unrelated to plaintiff's earning capacity.
Two expert witnesses testified for plaintiff. Edward I. Robbins, an actuary, using plaintiff's pay in his job with defendant as a base, computed plaintiff's annualized gross wages to be $15,979.05, and his annualized net wages to be $13,639.46. Assuming an annual rate of productivity and inflation of from 7% to 13%, and an annual interest rate of 8% or 12%, Mr. Robbins arrived at gross lost wages from July 28, 1977, to March 28, 1980, of from $51,675.00 to $58,335.00, and net lost wages of from $44,108.00 to $49,794.00. His best estimates were $54,286.00 for gross lost wages and $46,337.00 for net lost wages, which assumes a 10% productivity and inflation factor and 9% interest rate. His estimates of future economic loss varied from $139,029.00 to $206,171.00 based on gross wages and from $118,673.00 to $175,984.00 based on net wages, assuming the same variations in the productivity and inflation rates and the interest rates. His best estimates of future economic loss, based on a 10% productivity and inflation rate and a 9% interest rate, were $228,919.00 based on gross wages and $195,402.00 based on net wages.
Dr. Melville Wolfson, a forensic economist, using the same earnings figures as did Mr. Robbins, computed plaintiff's annualized gross wage as $15,197.00 and his annualized net wage as $12,709.00. Dr. Wolfson, assuming that the inflation rate would be 7% and the interest or discount rate would be 10%, computed future economic loss to be $134,927.00. Using a 5% discount and 7% inflation rate, he computed future economic loss at $170,000.00. Dr. Wolfson computed plaintiff's lost wages to be $38,787.00, without allowing any increase for inflation.
The trial judge adopted Mr. Robbins's figure of $15,979.05 as plaintiff's gross earning capacity per year at the time of the injury. From the income tax returns, he figured plaintiff's average income tax liability to be $399.00. He therefore assigned a net earning capacity of $15,500.00 to plaintiff.
Using this as a base, he awarded plaintiff $41,209.20 as lost wages from July 28, 1977, when he was injured, until the time of trial, on March 17 and 18, 1980.
He was of the opinion that the expert testimony justified an assumption that the interest or discount rate would affect the rate of inflation by approximately 1½%. He then stated:
"Therefore, recognizing the problems in forecasting an individual's exact worklife expectancy and in forecasting precisely the discount rates and the rate of inflation over that expected worklife, this Court finds that a lump sum award of ONE HUNDRED SEVENTY-FIVE THOUSAND DOLLARS ($175,000) fairly represents Mr. Hirstius' lost earning capacity as adjusted to reflect the effect of inflation and of a discount to present value."
Defendant's first argument is that the trial court erred in its finding of plaintiff's annual earning capacity at the time of the accident. It is argued that the proper way to ascertain this figure would be to average plaintiff's income from 1973 until the time of the accident. We disagree. Plaintiff is entitled to be compensated for his disability based on his earning capacity as of the time of the accident.
Next, defendant contends that the court erred in considering inflation as a factor in computing the economic loss. The Fifth Circuit Court of Appeals, en banc in Johnson v. Penrod Drilling Company, 510 F.2d 234 (5th Cir. 1975), cert. denied 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975), held that the effect of future inflation was *615 not to be included as a factor when calculating future damages. However, the circuits are divided as to whether the effect of inflation is a proper factor to be considered. In Norfolk & W. Ry. Co. v. Liepelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), a case under the Federal Employers' Liability Act, the Supreme Court approved the consideration of inflation in fixing awards for future economic loss. In this state, in Rains v. Diamond M. Co., 396 So.2d 306 (La.App. 3rd Cir. 1981); writ refused, 399 So.2d 623 (La.1981), the court held, in a case under the Jones Act and General Maritime Law, that inflation and cost of living increases were proper factors for consideration in determining future economic loss. We agree with this decision, and find no error in the holding of the trial judge in this respect.
Defendant further complains of the award of interest from date of judicial demand rather than from the date of judgment. It is true that in a Jones Act case, interest may be awarded only from the date of the judgment. However, plaintiff's case is brought under the General Maritime Law as well, and in such cases, the award of pre-judgment interest is discretionary with the trial court. We find no abuse of discretion in the award of pre-judgment interest in this case. Melancon v. I.M.C. Drilling Mud, 282 So.2d 532 (La.App. 1st Cir. 1973); writ refused, 283 So.2d 769, 771 (La.1973); Hebert v. Diamond M Co., 385 So.2d 410 (La.App. 1st Cir. 1980); writ denied, 390 So.2d 203 (La.1980).
The judgment appealed from is affirmed, at defendant's cost.
AFFIRMED.