444 So.2d 129 (1983)
Earl WRIGHT
v.
OCEAN DRILLING & EXPLORATION COMPANY, et al.
No. CA-0891.
Court of Appeal of Louisiana, Fourth Circuit.
December 9, 1983.
Motion to Dismiss Writ Application Granted February 10, 1984.
*131 Owen J. Bradley, Michael R. Guidry, New Orleans, for appellee.
Michael A. McGlone, James R. Silverstein, New Orleans, for appellants.
Before GULOTTA, KLEES and WARD, JJ.
GULOTTA, Judge.
In this suit under the Jones Act and general maritime law, Ocean Drilling & Exploration Company (ODECO) appeals from a $129,701.00 judgment in favor of plaintiff, who suffered a partial amputation of his right thumb while employed on defendant's drilling ship. We amend and affirm.
The accident occurred on September 27, 1981, on ODECO's ship Ocean Tempest. Plaintiff Earl Wright, a "roughneck" on the drilling floor, was removing drill pipe from the well hole when his thumb was smashed between the pipe top and heavy hoist equipment lowered to him by a fellowworker.
In written reasons for judgment, the trial judge concluded that Wright's co-worker, the hoist operator, was negligent "in dropping the elevator too quickly and in an unsafe manner", and that Wright was "free of contributory negligence". The damage award includes an amount for impairment of Wright's future earning capacity because of a 20% permanent disability to his right hand.
Appealing, ODECO contends the trial court erred: 1) in not finding plaintiff contributorily negligent; 2) in finding an impairment of plaintiff's earning capacity as an offshore oil worker; and 3) in awarding an excessive amount of damages and interest. In answer to the appeal, plaintiff seeks an increase in the award for loss of future wages.

NEGLIGENCE
ODECO argues that plaintiff negligently contributed to his injury by improperly clenching the handles of the hoist equipment instead of "palming" them with open hands. We reject this contention.
In the repetitive process of "tripping out" or removing drill pipe from the well hole, Wright's job was to guide the descending *132 hoist equipment onto the pipe top protruding "waist high off the drill floor". As a co-employee, known as a "driller", operated a console to lower the heavy device within their reach, Wright and a fellow "roughneck" seized it and influenced its lateral swing above the pipe so that its "elevators" or clamps could be latched around the pipe.
According to Wright, at the time of this accident, he grabbed the elevator handles or "ears" of the equipment as he had done "hundreds of times" before, but the driller caused the device to descend "too fast", smashing his thumb between the pipe and the elevator handle. Wright testified that "two seconds" elapsed between the time he first grabbed the elevators until they hit the pipe top, and that he could not have removed his hands before the crash. He further stated that he had grabbed the handles "naturally" as he had learned from observing other roughnecks. He had never been taught how to hold his hands during any ODECO training sessions or safety meetings.
According to William Wade, the operator of the hoist console at the time of Wright's injury, the elevator latch struck the pipe top because the ship "heaved" or rolled with a wave as Wright clenched the elevator handles while attempting to untangle the equipment. Wade testified that "two or three times" before this accident he had told Wright not to grip the elevator handles, but to guide them with open hands as Wade had been instructed when he was a roughneck. Significantly, however, Wade acknowledged, in answer to the court's questions, that the open or closed hand position had nothing to do with Wright's injury in this case, and that Wright was "doing what he was supposed to".
Wright's co-worker on the drilling floor, James Beam, likewise testified that the elevator "hung up", and Wright's thumb was caught between the "ears" on the elevator and the "box of the pipe" as he was trying to "wrassle the elevators off". According to this witness, Wright was working in a normal manner "except for the way he had his hands on the ears", i.e. gripping instead of palming them. James R. Richbourg, another witness to the accident, corroborated Beam's testimony.
David Webb, a driller for ODECO, also testified that he had instructed Wright to palm, not grab, the elevators so that his hands could be removed "clean and quick, if something happens". Webb knew of no "set", written ODECO safety rules, however, requiring placement of hands on the elevator latches in a certain position.
In Jones Act cases, a seaman's duty to protect himself is "slight". Although he must use reasonable care, a seaman has no duty to find the "safest" way to perform his work. Savoie v. Otto Candies, Inc., 692 F.2d 363 (5th Cir.1982); Ceja v. Mike Hooks, Inc., 690 F.2d 1191 (5th Cir.1982); Cooper v. Keyes Offshore, Inc., 421 So.2d 385 (La.App. 1st Cir.1982). Only where it is shown that a plaintiff knew or should have known of a safe alternative available to him can his choice of an unsafe course of action be properly considered in determining whether he was negligent. Ceja v. Mike Hooks, Inc., supra.
The evidence considered, we find no error in the trial judge's conclusion that plaintiff was free of negligence causing his injury. Although ODECO's witnesses testified that plaintiff had been taught to palm rather than clench the elevator handles, Wright denied receiving any such instruction. Furthermore, the evidence is insufficient to prove that palming the handles would have even prevented this particular, sudden accident.

IMPAIRMENT OF EARNING CAPACITY
According to ODECO, the trial judge's finding of an impairment of earning capacity disregards medical testimony that Wright can return to work as a "roughneck". Alternatively, ODECO argues that Wright's frequent change of jobs during his work history does not support a conclusion that he would have remained in offshore *133 work, despite his ability to do so. We disagree.
The distal tip of Wright's right thumb was partially amputated at the base of the thumb nail. After an unsuccessful attempt to reattach the thumb end, Wright's treating physician removed the damaged part, and grafted a flap of groin skin onto the remaining part of the thumb. This operation restored 80-90% of Wright's thumb length, although the grafted tip lacks sensation, differs in color from the rest of his thumb, and has no nail or bone supporting it.
Several physicians testified at trial or in deposition concerning the effect of this injury on Wright's ability to resume roughneck work. After evaluating the evidence, the trial judge concluded Wright had a 20% permanent disability of his right hand and could not return to his former work at ODECO.
In well written reasons, the trial judge stated:
"Plaintiff has clearly sustained an impairment of his earning capacity. Most of his past employments were general manual labor at minimum wages and on an intermittent basis.
"This employment with ODECO is the penultimate of unskilled manual labor and plaintiff held his job continuously except for a minor illness since September of 1979. Plaintiff earned over $10.00 per hour and received excellent fringe benefits.
"Plaintiff is now susceptible to re-injury and is a danger to others who may have to depend upon his ability to perform his tasks free of any impairments to his hands as described above.
"It is more likely than not that he will be unable to return to the oil industry because of this claim and his permanent handicap, but he will be able to return to other less beneficial work. This will cause plaintiff to incur a diminution of future wages, namely the differential between guaranteed minimum wages which he will earn and those wages he could have reasonably expected to receive from the lucrative oil industry."
Dr. Elliott Black, III, plaintiff's treating physician, testified that Wright has marked reduction in the touch sensation of his thumb tip, but has maintained the importance of the thumb's strength and mobility. He testified that Wright has a 20% impairment of function of the right thumb. Dr. Black was of the opinion, however, that plaintiff was capable of returning to roughneck duties after December 16, 1981.
Another physician, Dr. Claude S. Williams, also felt that Wright could return to work as an offshore roughneck. This physician, however, assessed a 15% loss of the function of plaintiff's right hand. In his deposition, the expert stated that Wright would have a problem in fine pinching and "somewhat of a problem" in grasping large objects with his hand. He also stated that the graft makes Wright less aware of painful stimuli and might subject him slightly to cutting or burning his thumb "because he won't get out of the way or something quite as quickly".
Dr. T. Sterling Dunn, a physician who gives ODECO's preemployment physicals, testified that Wright has "slight" reduction in the function of the hand, but could do all the duties of a roughneck. He would rate Wright as acceptable for roughneck work, but with a documented abnormality.
On the other hand, Dr. Bernard Manale, an orthopedic surgeon, has advised Wright not to return to roughneck duties. Dr. Manale rated Wright's anatomic disability at 15-20% and the functional disability of his thumb at 40% (as if he didn't have a thumb). This physician testified that Wright may not feel temperature extremes in his grafted thumb, and that chemicals may irritate it. He also pointed out that Wright "would be a risk of some sort" and could lose the thumb in a serious injury because the tissue does not have normal blood supply. Dr. Manale further noted that the grafted portion takes longer to heal and is more susceptible to infection. He indicated that Wright is "almost certain *134 to receive injuries if he returns to heavy work".
Randolph Howes, M.D., a plastic and reconstruction surgeon, likewise felt that Wright cannot return to offshore work because of danger of injury to himself or others. He stated that Wright's hypersensitivity at the junction of the groin flap and the thumb body might cause him to "let go" when grabbing with this area of the hand. Dr. Howes assessed an anatomical disability of 20% to Wright's hand.
Plaintiff testified that the junction of the groin flap and his thumb is sensitive, particularily to heat, cold and hard objects. Wright felt his thumb could be a safety impairment, and did not think he could return to roughneck work, which involves heavy equipment, wet conditions, and contact with chemicals.
According to Wright, the thumb does not toughen like the rest of his hand, and the skin of the graft becomes scabby and tender when wet. He has problems buttoning his clothes and tying his shoes, and had difficulty handling large sewer pipe in a job since this accident. He further pointed out that a roughneck's duties must be done quickly, and he could not avoid bumping the hypersensitive thumb while working. Wright is currently unemployed.
Considering this evidence, we find no error in the trial judge's findings of Wright's permanent disability and inability to return to roughneck work.
We are not persuaded by ODECO's argument that the court's conclusion ignores the findings of the treating physician Dr. Black, and those of Drs. Williams and Dunn. The trial judge was free to evaluate the differing opinions of all the physicians, and was not bound by the testimony of any of them.
We further reject ODECO's contention that plaintiff's work history does not support a finding that he would have continued his employment as a roughneck. As noted by the trial judge, despite Wright's earlier intermittent jobs, he had steadily worked for ODECO for nearly a year before this accident. It is not unreasonable, therefore, to infer that he would have remained in offshore work but for his disability. Accordingly, we find no error.

QUANTUM
The $129,701.00 award, with interest from date of judicial demand, includes the following elements:

 1. Physical and mental pain and
 suffering Past, present and
 future $25,000.00
 2. Mutilation, scarring, disfigurement
 and embarrassment
 to January, 1982 $15,000.00
 3. Past loss of gross wages and
 benefits $14,701.00
 4. Impaired earning capacity $75,000.00
 ___________
 TOTAL $129,701.00

ODECO raises several contentions concerning the excessiveness of the award. In answer to the appeal, plaintiff seeks an increase in the amount awarded for impaired earning capacity.
Impaired earning capacity
In awarding $75,000.00 for loss of future wages, the trial judge, citing state jurisprudence,[1] considered the residual disability, the probability of loss of earnings over plaintiff's work life expectancy to age 65, and the availability of reasonable employment opportunities suitable to him.
Under the established rule that federal law applies in actions under the Jones Act,[2] ODECO contends the award for future wage loss should be denied because the trial judge erred in relying exclusively on Louisiana jurisprudence. We disagree.
*135 Although we do not quarrel with the authorities cited by ODECO, the trial judge's reliance on state authorities does not compel a change in quantum.
A lump sum award for lost earnings represents "only a `rough and ready' effort" to restore the injured plaintiff to his former position. It involves an estimate of his "lost stream of future income" based on "after-tax" earnings for his "expected remaining career", which is then factored to present value by an "appropriate discount rate". Jones & Laughlin Steel Corp. v. Pfeifer, ___ U.S. ___, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983).
Thus under federal law, the general principal in determining a seaman's loss of earning power from injury is to place him in the same economic position as he would have been if his injury had not occurred, by determining what his annual earning power would have been but for the injury, deducting therefrom what it will be thereafter, multiplying the difference by the seaman's expectancy, and discounting the product to the present value. See Conte v. Flota Mercante Del Estado, 277 F.2d 664 (2d Cir.1960). Moreover, the federal courts also use a retirement age of 65 years in awarding future loss of earnings. See Toddy v. Arkansas Valley Dredging Co., 470 F.Supp. 692 (E.D.Ark.1979); Chamberlain v. Shaver Transportation Company, 263 F.Supp. 47 (D.C.Or.1966).
The federal law, therefore, is similar to Louisiana law concerning this aspect of damages. Accordingly, whether federal or state standards are applied, the result is substantially the same in our case.
We likewise find no error in the quantum of the award. The trial judge has great latitude in awarding damages, and his judgment will not be set aside unless the award is clearly erroneous. See Goodpasture, Inc. v. M/V Pollux, 688 F.2d 1003 (5th Cir.1982), cert. denied ___ U.S. ___, 103 S.Ct. 1775, 76 L.Ed.2d 347 (1983); Drake v. E.I. DuPont deNemours & Co., 432 F.2d 276 (5th Cir.1970). Despite an economist's estimation of Wright's future wage loss at $265,000.44, the trial judge was not bound to accept this figure. Considering the evidence and the factors articulated by the trial judge, we conclude the $75,000.00 award is neither inadequate nor excessive.
Further, we are not persuaded by ODECO's argument that the award should be reduced to a "net" amount after taxes.
Assuming that net, after tax income is the proper basis for an award for future impairment of earnings, there is no indication in the record that the trial judge in fact erroneously used gross income to arrive at the $75,000.00 figure. As stated in his written reasons, the award is simply "the differential between guaranteed minimum wages he [plaintiff] will earn and those wages he could have reasonably expected to receive from the lucrative oil industry". We cannot say the trial judge abused his discretion.
Past Wage Loss
ODECO further contends that the $14,701.00 awarded for past loss of gross wages, benefits and meal costs from September 26, 1981 to March 26, 1982, should be reduced to $6,399.00, based on plaintiff's net income from September 26, 1981 to January 1, 1982.
At the outset, we find no error in the time period employed by the trial court. Although Dr. Black was of the opinion that plaintiff could have returned to offshore work after December 16, 1981, it is significant that this physician did not assign a disability or discharge him from his care on that date because he "wanted to continue seeing him to make sure he didn't have any problems...." Dr. Black last saw Wright on March 4, 1982, when he noted that the "flap has taken nicely" and concluded Wright needed no more surgery. Plaintiff did not return to any form of employment until June, 1982.
An award for lost earnings should reflect the time necessary for recovery from the injury and a period of rehabilitation. See Sterling v. New England Fish Co., 410 F.Supp. 164 (W.D.Wash.1976). *136 We cannot say that the period from the date of the accident until March 26, 1982 was unreasonable.
We do find merit, however, to ODECO's contention that the past wage loss award should have been based on plaintiff's net rather than gross income for the relevant time period. See Varlack v. SWC Caribbean, Inc., 550 F.2d 171 (3rd Cir.1977). The trial court's award of $14,701.00 was based upon the calculations of plaintiff's economist using plaintiff's annualized gross base pay plus meals. Plaintiff's net pay for the same period, however, was $11,348.00 plus $1,350.00 for meals. Accordingly, we reduce the trial court's award for loss of past wages from the sum of $14,701.00 to the sum of $12,698.00, to reflect the prevailing federal rule.
Pain and Suffering; Disfigurement
We find no basis for reducing the awards totalling $40,000.00 for pain, suffering and disfigurement.
Wright's injury, treatment, and mutilation are vividly described in the trial judge's written reasons, as follows:
"The elevator nearly severed the distal tip of plaintiff's right thumb. His hand was packed in ice and he was flown to and admitted into West Jefferson Hospital where his thumb was reattached. The graft failed and the injured part was surgically amputated. The surgeon subsequently attached plaintiff's thumb to his groin where it remained until October 26, 1981 while new groin skin tissue matured around the stump. During this period, the plaintiff experienced extreme and agonizing pain and suffering. All of his normal activities were dramatically affected by his immobility. On January 16, 1982, he was discharged from active medical care."
* * * * * *
"Plaintiff, who is right handed, has a disfigured, grotesque and deformed right thumb. The color and skin texture of the graft are clearly in contrast with the rest of the hand skin. The court observed that the plaintiff, while relaxed and sitting at the bench, clenched his thumb into the palm of his hand and tended to conceal his mutilation to avoid embarrassment. The area is sensitive to pain at the graft juncture but has lost all sensation over the graft or flap area, exposing him to danger because of his inability to perceive and distinguish extreme heat, cold or pressure. The palomar side of the grafted skin does not possess the non-slip ability of the other skin and is 1½ centimeters shorter. Because of these conditions, plaintiff avoids using his thumb and hand which has caused atrophy of his right arm. Because of the anesthesia of the flap, plaintiff's ability to grasp, clasp, and clutch objects is impaired. The flap is flabby and mushy and is unsupported by normal bone."
The testimony and photographic exhibits support these findings. We find no error.
Prejudgment Interest
Finally, we reject ODECO's contention that the trial judge erred in awarding plaintiff interest from date of judicial demand rather than the date of judgment. An award of prejudgment interest is discretionary with the trial court in cases governed by the Jones Act and the general maritime law. See Havis v. Petroleum Helicopters, Inc., 664 F.2d 54 (5th Cir., 1981); Hirstius v. Louisiana Materials Co., Inc., 413 So.2d 611 (La.App. 1st Cir.1982), writ denied 415 So.2d 943 (La. 1982). We find no abuse of discretion.

DECREE
For the foregoing reasons, the judgment is amended as follows to reflect a reduction in the award for past loss of wages and benefits:
The judgment in favor of plaintiff in the sum of $129,701.00 is reduced to the sum of $127,698.00. In all other respects, the judgment is affirmed.
AMENDED AND AFFIRMED.
NOTES
[1] Philippe v. Browning Arms Co., 395 So.2d 310 (La.1981); Bize v. Boyer, 408 So.2d 1309 (La. 1982); Holmes v. Texaco, Inc., 422 So.2d 1302 (La.App. 5th Cir.1982); Merrell v. State Through Dept. of Transp., 415 So.2d 660 (La.App. 3rd Cir.1982); Wilson v. Aetna Cas. & Sur. Co., 401 So.2d 500 (La.App. 2nd Cir.1981).
[2] Norfolk W. Ry. Co. v. Liepelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980); Barboza v. Texaco, Inc., 434 F.2d 121 (1st Cir.1970).